FILED

IN THE UNITED STATES DISTRICT COURT 98 FEB 27 PM 2: 19
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION          U.S. DISTRICT COURT
                                N.D. OF ALABAMA

BRANDY BLACKWOOD,                )
                                 )
          Plaintiff,             )
                                 )
vs.                              )    Case No. CV-96-TMP-2655-NE
                                 )
CITIZENS BANK OF LAWRENCE        )
COUNTY and GREGORY GENTRY,       )
                                 )
          Defendants,            )    ENTERED

                                      FEB 2 7 1998

MEMORANDUM OPINION

This cause is before the court[1] on the defendants'
motions for summary judgment, filed September 17, 1997,
(Documents 17 and 18) and defendants' motion to strike certain
evidentiary materials[2] submitted by the plaintiff in opposition to
the motions for summary judgment, which was filed on November 14,
1997, (Document 35).   The motions are now under submission
following briefing and a hearing conducted on November 21, 1997.

---

[1]

The undersigned magistrate judge is exercising jurisdiction
under 28 U.S.C. § 636(c) pursuant to the joint consent filed by the
parties on January 20, 1998, (Document 41) and the court's General
Order of Referral, dated July 25, 1996.

[2]

The motion to strike has been granted in part without
objection by the plaintiff and denied in part in a separate order
and will not be discussed extensively here.

For the reasons explained below, the court concludes that the motions for summary judgment are due to be granted.

Because the defendants have moved for summary judgment, the court must determine whether there are any genuine issues of material fact and whether the moving defendants are entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See F.R.Civ.P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of fact and that he is due to prevail as a matter of law. See Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon her pleadings, but must come forward with evidence supporting each essential element of her claim. See Celotex Corp. v. Catrett, supra; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Barfield v. Brierton, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving her action, is able to show

2

some evidence with respect to each element of her claims, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, supra; Bennett v. Parker, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure to prove concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

Bennett v. Parker, 898 F.2d at 1532.

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, have been taken in a light most favorable to the plaintiff. Plaintiff Brandy Blackwood went to work for defendant Citizens Bank of Lawrence County (hereinafter "Citizens Bank") following her graduation from high school in May 1995. She was eighteen years old at the time. The decision to employ her was made by defendant Gregory Gentry, the son of the bank's board chairman, Wayne Gentry.

3

Although Gentry's position with the bank is not clear, it is clear that he exercised some degree of influence and authority as he has been described to have supervisory authority over the tellers. After undergoing a three- to four-week period of training, plaintiff was assigned to work as a teller in the drive-in window, which was located in a small building separate from the main bank building.

About two weeks after she started work, Gentry asked plaintiff to go to lunch with him. She accepted and they went to the Moulton Steak House. During the lunch, Gentry remarked that, if plaintiff would marry him, she would never have to work again. Plaintiff did not respond at all, either positively or negatively. (Plaintiff's Deposition, p.47). Other than that remark, Gentry made no other comments or engaged in any conduct that plaintiff thought was improper, either during the lunch or while at the bank.

Gentry continued to ask plaintiff to go to lunch about every week to week and a half. Several times plaintiff declined, claiming to have other plans. Two or three weeks after the first lunch, plaintiff again accepted a lunch invitation, thinking that if she did so, Gentry would stop asking. Although Gentry invited her to lunch, she suggested that they go in her car. After lunch, she offered Gentry a cigarette, to which he replied, "No, I only smoke after sex." (Plaintiff's Deposition, p.54). To discourage

4

Gentry, plaintiff decided to introduce him to her boyfriend, Shane Tuggle, who worked as a delivery man for a Pepsi bottling company. Without explaining to Gentry, plaintiff then drove both of them out into rural Lawrence County until she located Shane making a delivery at Wrenn's Grocery. Plaintiff introduced Gentry and Shane, but recalls nothing else about the conversation. Plaintiff and Gentry then drove back to the bank. Gentry made no other inappropriate remarks or engaged in any other improper conduct toward plaintiff.

Some period of time later, plaintiff was speaking to Gentry about a speech she was required to make as part of a college class she was taking. She asked him what topic he thought she should speak on, and he suggested the stock market and told her that he would gather some material on it for her to use. About a week later, Gentry delivered to plaintiff a fully-prepared speech he had written for her, explaining the workings of the stock market in relation to certain products, including Pepsi. At the end of the speech, he had written, "Pepsi is a good product, but sometimes you need to try something new." Plaintiff took this as a reference to her boyfriend Shane, who worked for Pepsi. Plaintiff accepted the speech and, with some changes, gave it as her assignment in speech class.

A week or two after giving her the speech, Gentry told plaintiff about an occasion when he had come out to the college she was attending to look for her and invite her to go drink a beer. He did not find plaintiff or her car in the parking lot. When he asked what building her classes were in, she told him but stated she could not remember the room number of the classroom. She did not indicate to Gentry that she was not interested in having a beer with him. (Plaintiff's Deposition, p.73).

Gentry again called on plaintiff two or three weeks after he gave her the speech. One evening while talking to Shane on the phone, plaintiff received a call from Gentry, who said he was in a phone booth in Decatur (the city in which she lived). When plaintiff told him she had another call, Gentry said he would call back in five minutes, and plaintiff replied, "okay." (Plaintiff's Deposition, p.77). When Gentry called again, he asked her if she would like to go out and eat a pizza, but plaintiff declined. A short while later, Gentry appeared at plaintiff's door bearing a pizza and soft drink. When plaintiff opened the door, she took the pizza and soft drink, and Gentry said, "I don't know what everyone thinks I'm trying to do to you. I'm just trying to be nice." Plaintiff then asked Gentry if he had been drinking, to which he replied, "Hell, no," and then left. (Plaintiff's Deposition, p.81).

6

The next morning plaintiff reported Gentry's advances for the first time to her immediate supervisors, Robin Legg and Reba Alexander. She complained that Gentry was persistently asking her to lunch and was working with her in the drive-in booth. She felt another woman should be assigned to work the drive-in, because Gentry was a supervisor. Reba Alexander, the bank's head teller, asked plaintiff if she wanted Alexander to speak to Gentry, but plaintiff declined, saying that she could handle it herself.[3] Plaintiff also met that same day with bank Vice President Bobby Norwood, but because she did not want them to speak to Gentry, no action was taken. Thereafter, plaintiff did speak to Gentry, telling him not to call her or come to her house or ask her out.

Although Gentry refrained from asking plaintiff out for a few weeks, by mid-October of 1995, he again asked plaintiff if she would like to go to a football game with him in Birmingham. She declined, saying that she was going to the game with her boyfriend, Shane Tuggle. Gentry replied that if he saw her there, he "would kick her ass." There was no meeting or confrontation at the football game. There is no evidence that plaintiff reported

---

[3]

Reba Alexander testified so in her deposition, while plaintiff testified only that she did not remember making that statement. In her affidavit, plaintiff did not deny making the statement, but reiterated that she did not remember it.

7

this incident to higher management at that time.  She also declined Gentry's invitation to a football game in early November.

In early November, Gentry told plaintiff that he would bring his motorcycle to work the next day and that she should wear pants so they could go riding after work.  When plaintiff arrived at work the next day wearing a dress or skirt, Gentry became upset and insisted that she ride with him anyway.  He told her that she could pull up her dress and that no one would know the difference.  She declined despite his insistence.

Two other incidents shed light on the relationship between Gentry and plaintiff.  On November 2, 1995,[4] while both she and Gentry were working in the drive-in booth, a Pepsi commercial came on the radio which proclaimed that "Nothing else is like a Pepsi," to which plaintiff added, "That commercial is true."  Gentry then unplugged the radio and stomped it to pieces, saying, "This is what I think of Pepsi."  Plaintiff complained about the incident to her supervisor, Robin Legg, and Bobby Norwood.  She was asked by Norwood to write a list of the problems she was having with Gentry and then for her to discuss them with him.  (Norwood Deposition, Exh.1).  No other action was taken.

---

[4]

The date of the incident is supplied by Greg Gentry's affidavit, which is not disputed by plaintiff as to the date.

On another occasion, the date of which is unclear, Gentry instructed plaintiff to turn off the air conditioning in the drive-in booth.  This required plaintiff to climb up on a table to reach the controls.  When she did so, she looked back and saw Gentry getting onto his knees in an apparent effort to look up her dress. She immediately jumped down from the table.  There is no indication in the record that she reported this incident immediately, although it was discussed later with Norwood on November 8, 1995, the day before she resigned.

By early November, plaintiff secured work at another bank in another city and she told her supervisors that she would be leaving.  She also delivered her written resignation to Gentry.  He tore it to pieces and said, "Goddammit, Brandy, you're not quitting," and that he would buy out any bank she went to work for. He offered her a raise if she agreed at stay, but she declined. She met with Norwood, Alexander, and Legg on November 8 and delivered to Norwood the list of things done by Gentry that she felt were inappropriate or which made her uncomfortable. (Plaintiff's Deposition, Exh.6).  Norwood recounted the things that had upset plaintiff and agreed that she was not required to put up with harassment.  He suggested that she contact the EEOC, but no other possible solutions were discussed because she had already indicated that she was leaving for other work.

On November 10, 1995, plaintiff was called into the office of Wayne Gentry to meet with him and Greg Gentry. When she entered the room, Greg Gentry locked the door behind her. Greg Gentry made a long rambling statement indicating that he was glad when he first learned she was coming to work for the bank, that he suffered from depression, that he may have been too persistent in his attentions to her, that he could not take no for an answer, that others at the bank were out to cause him trouble, and that he was getting mixed signals that perhaps she was interested in his attention. He then apologized, saying he had no intention of harassing her. Wayne Gentry then asked plaintiff, "What do you think about it, Brandy?" Plaintiff replied, "I'm not going to do anything, I mean I'm just going to leave, and that's going to be the end of it." Wayne Gentry then suggested that plaintiff get Reba Alexander to type a resignation letter, and the meeting ended. A resignation letter was typed at that time, dated November 10, 1995. It is unclear whether she actually worked, but she was paid through November 20, 1995.

Within a few days after leaving the bank, plaintiff called Gentry to say that she had no hard feelings and that she "still wanted to be friends." (Plaintiff's Deposition, p.158). Gentry stated that he too had no hard feelings. After plaintiff filed her EEOC charge of discrimination, however, Gentry wrote a

10

letter to her in February 1996 expressing his disappointment and his disagreement with her allegations. The letter ended, "All I can say about the EEOC is that you better win then -- cause then it'll be my turn with the courts."[5]

## Plaintiff's Title VII Claim

At the outset, the court reads plaintiff's Title VII claim to allege discrimination due to sexual harassment causing a hostile and abusive work environment. Although the plaintiff's First Amended Complaint refers to Gentry as her supervisor and that he used his supervisory position to engage in unwanted sexual advances toward her, it does not seem to allege *quid pro quo* harassment. Indeed, none of plaintiff's evidence suggests that Gentry made any explicit or implicit demands for sexual favors linked to her job security, performance, advancement, or other tangible job condition. "*Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands." *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1113, 1115 (11th Cir.

---

[5]

Plaintiff also has attempted to offer evidence that Gentry came to her place of employment months later, but because she had no personal knowledge of that incident, only hearsay related to her by other employees, the court cannot consider it.

11

1989)(citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986)); see *Farley v. American Cast Iron Pipe Company*, 115 F.3d 1548, 1551 (11th Cir. 1997)(citing *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982). There simply is no evidence that plaintiff's employment was altered, or that there was any threat of alteration, due to her refusal to submit to any demands for sexual favors from Gentry. While plaintiff asserts that she was constructively discharged, she does not allege or offer evidence that there were any explicit or implicit threats to her employment tied to demands for sexual favors by Gentry. Indeed, there is no evidence that Gentry made any explicit or implicit demands for sexual favors from her. Thus, plaintiff's Title VII claim is grounded on a hostile work environment theory, not *quid pro quo*.

To be entitled to relief for hostile work environment sexual harassment under Title VII, 42 U.S.C. § 2000e, the plaintiff must show that (1) she was a member of a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment was so severe and pervasive as to create an objectively hostile and abusive work environment, and (5) she subjectively perceived the work environment to be hostile and abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. ___, 114 S.Ct. 367, 126 L.Ed. 2d 295 (1993); *Meritor*

*Savings Bank, FSB v. Vinson, supra; Henson v. City of Dundee*, 682
F.2d 897 (11ᵗʰ Cir. 1982). While not every isolated offensive
comment or action rises to the level of violating Title VII, the
harassment need not be so severe as to cause psychological damage
to the plaintiff.

It is clear that Gentry, as plaintiff's co-employee,
cannot be held liable under Title VII; the remedy provided by Title
VII lies only against the employer. "Individual capacity suits
under Title VII are ... inappropriate." *Busby v. City of Orlando*,
931 F.2d 764, 772 (11th Cir. 1991); *Edwards v. Wallace Community
College*, 49 F.3d 1517 (11ᵗʰ Cir. 1995).

The employer Citizens Bank can be liable for the hostile
work environment harassment by its employees either directly or
indirectly. *Faragher v. City of Boca Raton*, 111 F.3d 1530 (11ᵗʰ Cir.
1997)(en banc), <u>cert. granted</u> ___ U.S. ___, 118 S.Ct. 438, 139
L.Ed. 2d 337 (1997). The employer is directly liable if it has
either actual or constructive knowledge of the harassment and fails
to take prompt remedial action. *Id.* at 1538; *Allen v. Tyson Foods,
Inc*, 121 F.3d 642 (11ᵗʰ Cir. 1997). The employer can be indirectly
or vicariously liable under either of two circumstances: "(1) when
the harasser is acting within the scope of his employment in
perpetrating the harassment ..." or "(2) when a harasser is acting
outside the scope of his employment, but is aided in accomplishing

13

the harassment by the existence of the agency relationship." *Id.* at 1536 (citing *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554 (11th Cir. 1987).

The undisputed evidence fails to show that Citizens Bank is indirectly liable. Certainly, the conduct engaged in by Gentry, however it may be characterized, was not within the scope of his employment. Gentry was not advancing the goals or interest of the bank by asking plaintiff on dates, by going to her home, by writing a speech for her, or by any of the other acts identified by plaintiff. Gentry was pursuing a purely personal, romantic interest, completely outside the scope of his employment.

Furthermore, Gentry was not aided by the existence of the agency relationship. As the Eleventh Circuit has explained:

> [T]he employer is liable only if the harass-
> ment is accomplished by an instrumentality of
> the agency or through conduct associated with
> the agency status. [Citation omitted]. In
> *Sparks,* for example, the harasser used the
> authority delegated to him by the company to
> assist in the harassment: He [sic] repeatedly
> reminded the victim that he could fire her if
> she refused his advances.

*Faragher v. City of Boca Raton,* 111 F.3d 1530, 1537 (11th Cir. 1997)(en banc), <u>cert. granted</u> ___ U.S. ___, 118 S.Ct. 438, 139 L.Ed. 2d 337 (1997). As already mentioned, Gentry never explicitly

14

or implicitly threatened plaintiff's job, or otherwise used his authority as a member of the bank's upper management to carry out his advances to the plaintiff.   Consequently the bank cannot be indirectly liable for Gentry's conduct.

If liable at all, the bank is directly liable because it either knew of or should have known of Gentry's conduct toward plaintiff and failed to take prompt remedial action.   The court concludes that Gentry's harassment, if it was that, was not so pervasive that the bank should have known about it before plaintiff complained for the first time in mid-October 1995.   The court must "evaluate the totality of the circumstances both in determining whether the work environment was abusive and in determining whether the conduct was pervasive enough to put the employer on notice." *Faragher*, at 1538; *Allen*, at 647.   Looking at the totality of the conduct complained of by plaintiff, it was not pervasive enough to put the bank on notice that Gentry was harassing plaintiff.   Much of it occurred away from the bank or in private phone or lunch conversations.   What did occur at the bank was so isolated and intermittent during the period before plaintiff complained that supervisory employees had no reason to suspect that anything was wrong.   While plaintiff has attempted to offer proof that Gentry was the subject of another sexual harassment case five years

15

earlier, this alone does not establish that bank officials should have been suspicious of Gentry's conduct toward plaintiff.[6]

In mid-October, after Gentry brought a pizza to plaintiff's house one night, plaintiff complained to Reba Alexander, Robin Legg, and Bobby Norwood. That was the very first time any higher management officials at the bank received notice of the alleged harassment. At that time, however, she told them not to talk to Gentry because she would handle it herself.[7] Because plaintiff declined to pursue the complaint, the bank was under no obligation to undertake any remedial action. In a similar case, *Fleming v. Boeing Company*, 120 F.3d 242 (11th Cir. 1997), a female employee complained to her supervisor about harassing behavior by a male co-worker. The supervisor reported it to higher officials in the company who in turn contacted the victim. The victim declined to press a complaint against the co-worker, saying "that the situation was better since she had spoken to [the offending co-

---

[6]

Plaintiff also attempts to offer hearsay that Gentry had a reputation for pursuing attractive, young tellers at the bank. But because this is only hearsay, the court cannot consider it.

[7]As explained earlier, this fact is undisputed by plaintiff. Alexander and Legg testified that plaintiff told them not to talk to Gentry, while plaintiff has testified only that she does not remember saying that. She has not explicitly denied making the statement. Thus, she does not dispute that she may have told them not to talk to Gentry, but she simply does not remember it now.

16

worker]." *Id.* at 247. When the employee complained again a month later, the company started an investigation leading ultimately to disciplinary action against the male co-worker. The court of appeals held that the company "took immediate and appropriate corrective action," launching an investigation as soon as the victim made a complaint that she was willing to pursue.

   *Fleming* provides guidance in the instant case. When plaintiff first complained, she specifically declined assistance offered by Reba Alexander, saying she would handle the problem herself. It was only on November 2, 1995, when plaintiff reported the radio-smashing incident that she indicated she wanted help. Vice President Norwood asked her to write down all of the problems she was having with Gentry and they would meet again to discuss them. In effect, Norwood started an investigation by asking plaintiff to give him detailed, written information about the alleged harassment. A mere four work days[8] later, however, plaintiff again met with Alexander, Legg, and Norwood, delivering to them the list she had compiled, but also telling them that she had found work at another bank and would be leaving to accept that employment. The defendant bank had a window of only four work days

---

[8] November 2, 1995, fell on a Thursday, and November 8 was the following Wednesday. Between these dates were six calendar days and only four work days.

17

to undertake remedial action before it became clear that plaintiff was leaving and that no remedial action would be effective.

Plaintiff cannot support a claim for constructive discharge because she did not give the bank a reasonable opportunity to correct the problems she was experiencing. "A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). Such is precisely the case here. Once plaintiff made clear to the bank that she wanted it to do something to stop Gentry's advances, she gave it only four work days before deciding to resign in favor of another job. This was not sufficient time for the bank to undertake a reasonable investigation of her complaint and to take corrective measures. Because the bank tried to undertake "prompt remedial measures," even though they were aborted by plaintiff's decision to take another job, it is not liable for the alleged harassment by Gentry. The bank did not fail in its duty to provide her relief from the alleged harassment, but immediately undertook to gather information from her on which to proceed. Before that investigation even got started, however, plaintiff notified the bank that she was leaving. The employer did not violate plaintiff's rights under Title VII, and the bank is entitled to summary judgment on the claim.

## Plaintiff's Claim for Invasion of Privacy

Plaintiff also has sued the bank and Gentry under Alabama law for the tort of invasion of her privacy.[9]  Clearly, the bank cannot be held liable for this tort under the undisputed facts of this case because, as explained above, Gentry's conduct was not done within the scope of his employment or for the benefit of the bank.  In *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752 (11th Cir. 1996), the Eleventh Circuit addressed the Alabama tort of invasion of privacy in the context of sexual harassment, explaining:

> Thompson and Brock can be held directly liable for invasion of privacy only if the company authorized or participated in Schultz's actions or ratified his conduct after learning of the action.  Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).  It can be held vicariously liable only if Schulz's acts "were done in the line and scope of employment" for Thompson and Brock's benefit.

*Id.* at 754.  Plainly, Gentry's conduct was purely personal and not within the line and scope of his employment or for the benefit of the bank.  Similarly, there is no evidence that the bank autho-

---

[9]

Although the First Amended Complaint also stated a tort claim for outrage, plaintiff conceded in her summary judgment brief that she cannot support the claim and expressly withdrew it.  See Plaintiff's Memorandum in Opposition to Summary Judgment, note 1.

19

rized, participated in, or ratified his conduct toward plaintiff after she reported it to Norwood. Indeed, the bank seems to have started an investigation that was prematurely aborted by plaintiff's resignation, suggesting just the opposite of ratification. Thus, the bank is entitled to summary judgment on plaintiff's state tort claim.

The court also believes that defendant Gentry is entitled to summary judgment on the tort claim. To establish this claim, the plaintiff must present evidence that Gentry made a "wrongful intrusion" into her physical solitude or seclusion, or into her "private activities in such a manner so as to outrage or to cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.". *Hogin v. Cottingham*, 533 So.2d 525, 530 (Ala. 1988)(quoting *Smith v. Doss,* 251 Ala. 250, 37 So.2d 118 (1948)).

The undisputed facts simply fail to present anything approaching this standard. While Gentry was undoubtedly persistent in seeking a romantic relationship with plaintiff, he never solicited sexual favors, never touched her in an offensive manner, never asked her offensive personal questions, or made any offensive comments about her person or activities. While he came *to* her house, he did not go in but remained in the semi-public area of her driveway. He tried unsuccessfully to find her at Calhoun Community

College, but merely drove through the public parking lot looking for her or her car.

The only incident that arguably comes close to being an offensive physical intrusion is the allegation that Gentry attempted to look up her dress when she attempted to turn off the air conditioner.  But this isolated incident was so minor and inconsequential that it cannot be said that it alone would cause a person of ordinary sensibilities to suffer mental pain or humilia- tion sufficiently severe to be actionable.  Although annoying and infantile, Gentry's alleged attempt to look up her dress would not cause significant shame or humiliation in a person of ordinary sensibilities.

In sum, the court finds that Gentry's conduct toward plaintiff did not involve any offensive intrusion into her physical seclusion or private activities of sufficient severity to be actionable. As such, the undisputed evidence viewed favorably to the plaintiff fails to support a claim for invasion of privacy and, therefore, Gentry also is entitled to summary judgment on this claim.

### Conclusion

Viewing the evidence most favorably for the plaintiff and drawing all reasonable inferences in her favor, there is not

21

sufficient evidence from which a reasonable jury could conclude that plaintiff can prove all of the elements of her claims. By separate order the court will grant the motions for summary judgment filed by defendants and dismiss this action with preju-dice.

DATED this 27th day of February, 1998.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

22